Case number 19-5222, Merck & Co., Inc. et al. v. United States Department of Health and Human Services et al. appellants. Mr. Davis for the appellant, Mr. Brass for the appellee. Mr. Davis, good morning. Good morning. May it please the Court, Ethan Davis for the United States. The statutory authority questioned in this case begins with a plain text of the statute. Section 1302 gives HHS the authority to publish rules and regulations as may be necessary to the efficient administration of Medicare and Medicaid. Efficient means acting with a minimum of waste or expense. Administration in this context means the management of a government or large institution. So CMS's role is therefore to manage the Medicare and Medicaid programs with a minimum of waste and expense. In other words, CMS's goal is to pay for drugs and services without wasting money paying artificially inflated prices. Now, requiring the disclosure of list prices in direct-to-consumer advertisements is closely connected to the efficient administration of Medicare and Medicaid. The United States is experiencing a crisis in prescription drug costs. Costs per Part D beneficiary have increased 40 percent over the last decade. Part of the problem is the lack of transparency over prices. And so requiring price disclosure will encourage manufacturers to compete on price, promote consumer understanding of the cost of drugs, and encourage conversations between consumers and doctors about lower-cost alternatives. Now, the District Court concluded that drug manufacturers do not participate in Medicare or Medicaid. Well, that's just not true, as my colleagues on the other side now concede. As a condition for paying for their drugs, CMS requires drug manufacturers to pay rebates to states, to pay rebates to 340B entities, and to pay rebates to certain Medicare Part D beneficiaries. If you could help me understand a little bit more, are there, when it comes to Medicare Part B, as in boy, not D, payments, are there contracted-for payments that are settled in advance, or how is that determined? You do pay for prescription drugs under Medicare Part B as well, correct? Correct. And how are the prices for those? Is there some sort of contractual determination or negotiated price, or do you do that with drug companies? So reimbursement under Part B, Your Honor, is tied, in most cases, to the average sales price of the drug. Okay. Not the WAC. Not the WAC. However, the average- But you don't negotiate those prices, or did you negotiate to the average sales price? How did that come to be what you pay under Medicare Part B? How did you change the relationship? And now that's the price that Medicare pays. Okay. So that's statutorily set for Medicare Part B. I believe that's correct, Your Honor. Okay. Go ahead. I'm sorry. The other point I was going to make is that the ASP is closely related to the WAC. I think a large percentage of the top Part B drugs have an ASP that is less than 10 percent different from the WAC. They tend to be higher than the WAC? I think they tend to be a little bit lower than the WAC. Lower? Because it's a price that includes some discounts and rebates, whereas the WAC does not. But also, during the first year or so of some Part B drugs, when they don't have an established ASP, that reimbursement can be based on the WAC in those circumstances. So it's either based on the WAC itself or on a metric that is closely related to the WAC. Okay. And then under Part D, I'm sorry, explain to me again exactly, is it a contractual relationship or how would you describe the relationship you have with prescription drugs manufacturers that want to have their drugs, obviously, in this very large program? So in Part D, Medicare is not allowed to interfere in the negotiations over drug prices. There's a statutory prohibition on that. So what happens is Part D plans or pharmacy benefit managers, on behalf of Part D plans, negotiate drug prices with pharmacies. They create what's called a negotiated price. That negotiated price is very often expressed as a function of the WAC, so it is closely tied to that. And then Medicare beneficiaries, in turn, frequently pay coinsurance on the negotiated price. So they're effectively paying a percentage of a metric that is closely related to the list price. And along those lines, I'd point out, Your Honor, that many of the drugs that are going to be subject to this rule tend to be the higher cost, more profitable drugs. So they tend to be specialty drugs or non-preferred drugs, which tend to be on the kinds of drugs that Part D beneficiaries pay coinsurance on, not copayments. So, you know, this rule really does affect or the list price, at least the one associated with the drugs at issue in this rule, really does have a gravitational impact on the prices that consumers actually pay. And does every drug manufacturer participate in Part B and Part D? I mean, I assume they have a choice if they wanted to do something higher than the ASP for Part B, or if they didn't like the negotiations. I'm just trying to figure out, because your brief sort of said this is just for companies that want to participate in these programs. I'm trying to figure out if that's 100 percent of all drug manufacturers or manufacturers selecting out of any of these programs, because you've got a big population to offer to them. Right. Your Honor, I'm not sure if any drug manufacturers don't participate in Medicare or Medicaid at all. I mean, I would suspect that, you know, if you have an FDA-approved drug, then one of the benefits of that is that you're generally going to get reimbursed by Medicare and Medicaid. But I'm not completely sure of the answer to that. What is the thing that you think you're efficiently administering with this rule? Your Honor, we're efficiently administering Medicare and Medicaid. And what are Medicare and Medicaid? They are programs that pay. I'm saying with this rule, I understand what Medicare and Medicaid are. I understand what administration normally means. I don't understand the connection between this rule and efficiently administering those programs. So, Your Honor, Medicare and Medicaid pay for certain drugs and services. And what CMS is regulating here are the very drugs that it pays for. We're not regulating the drugs. We merely establish a rule with respect to notice. That's all. We respectfully disagree. And there are large chunks that are excluded, depending upon whether they're covered by insurance. I mean, the thing is you're relying very heavily on mourning. And we have said, and I realize you have one recent case in which Judge Hunterson dissented, that did apply mourning more or less in the way that you would like to apply it. But the connection there between the regulation and the purpose of the statute seems to be very clear. I don't understand your reading mourning in a way to say if an agency has the right to engage in notice and comment rulemaking, all they have to do is show that they're regulating something with respect to which the statute refers. We've rejected that. That is not the law. Your Honor. You seem to be saying as long as you're in an area with respect to which the statute generally pertains, you're fine. No, Your Honor. That's not our position. I don't see the close connection, which I thought post-mourning you have to have. Your Honor, we believe there is a very close connection. Very close. A very close connection between the phrase. Tell me what it is, because that I missed. Arguably, there's a connection, but very close never occurs. Your Honor, the statute uses the phrase efficient administration. Those are words with meaning. Efficient administration of the functions with which it is charged. And not just efficient administration. If you're talking efficient administration, maybe you could scramble up to very close where you want to be. But it says of the functions with which it is charged. And one of those functions, Your Honor, a major function is the payment for particular drugs. And what this rule does is it will reduce the amount that CMS pays for particular drugs. It will make it more efficient. How do we know that? Because the purpose of the rule is to encourage consumers to A, lose some interest in the very higher priced drugs, and B, talk to their doctors about potentially lower cost alternatives. I mean, I think it's. Does the rule require all of that? It does not require it, Your Honor. I'm not getting. All it is is a notice rule. Your Honor, I think. It merely says you have to show in not all circumstances. In some circumstances, you have to give a notice of the wholesale price. That's all. I think it's a rule. So how does that get to efficient administration of the functions with which it's charged? It's not a price control regulation. And indeed, people can buy as they see fit. They're not required to go see their doctor under the rule. So I'm not seeing the connection. Correct, Your Honor. But it is a well-accepted economic principle that price transparency leads to more efficient markets. And what will happen here is a consumer who sees an ad on television for an extremely high-cost drug but maybe doesn't know what the price is, is far more likely to go ask the doctor to prescribe that drug. And the doctor doesn't know what the price is either. I read the study you cited, and it seems to me they're critical in what their conclusions are with respect to that supposition. I don't think that's correct, Your Honor. The JAMA study fully supports what we're saying here. What that study shows is that when the consumer sees a high price associated with a particular drug, that consumer loses interest in that drug. Now, when there's a disclaimer included that the consumer's price may be as low as zero, then the consumer is more likely to talk to the doctor about that drug. And so you can see how if the consumer goes to the doctor about a high-priced drug and informs the doctor, I want this drug, doctor, but the TV ad says it costs many thousands of dollars a month, the doctor may be more likely to prescribe a lower price. Does the notice require information with respect to the relative cost of the drug? It's just a statement of the wholesale cost, that's all. That's not telling the consumer what you're suggesting. That is, I don't worry about this drug because it's higher priced. You don't know that from what you're requiring. You don't know whether it's higher priced as compared to other drugs. You simply know the wholesale price of this drug. That's all. Your Honor, the wholesale, the WAC of a particular drug is an anchor price that exerts a gravitational force on virtually everything that follows. And if you can look at the table in the rule at Joint Appendix 206, which has a list of the 20 drugs most frequently advertised on television, you can see from that table that the list price, a higher list price, almost always means a higher out-of-pocket cost for the consumer, and a lower list price means a lower out-of-pocket cost. What I'm asking you is what you're requiring. Tell the consumer anything about how this drug is priced as compared to comparable drugs. No. It doesn't. It just gives an absolute wholesale price. That's all. Your Honor, that's a real price that's associated with a real drug. I know, but does it tell me when I go look at what you're requiring, does it tell me how that compares with how comparable drugs are being priced? What it tells you, Your Honor, is an anchor price about that particular drug. And if it's a very high-priced drug. How do I know it's very high? You may see another advertisement. I may or may not see it. Could you compel them to put a notice that says, here's what our wholesale price is, and as compared to other drugs on the market, this is really high, could you require that? Because that's not what you require.  I think that could very well be within CMS's authority, Your Honor, to require something like that. I mean, again, it's a disclosure of a price associated with a drug that CMS actually pays for. So you could require a manufacturer to indicate on a label, here's what our wholesale price is, and here are the comparative drugs, and here's what they charge. I don't see – I mean, I'd have to know the specifics of that. I'll give you the specifics. But I don't see a necessary problem with that, Your Honor. I think that the key limiting principle that we have here is that this is a regulation that is targeted at the particular drugs and services that CMS actually pays for. Many of the hypotheticals in the other side's brief and in some of the amicus briefs involve regulating particular products and services that CMS does not pay for, like hospital executive compensation. Can you tell me on Medicaid, because we talked about Medicare, are Medicaid prices negotiated at the state level? Do they use the ASP as well? I know there's the whole rebate program. Do they pay the WAC? So my understanding of Medicaid, Your Honor, is that the prices are set by formula in state plans, state Medicaid plans, which are then – And each state can vary as long as it's approved by the Secretary. Correct, and as long as the Secretary approves it, each state can vary, and then the states make payments. Does any state pay the WAC, as far as you know? I don't know the answer to that, Your Honor. Probably unlikely, though. I think I would agree with that, although I'm not totally sure. I would say that even in Medicaid, there is some connection. I don't want to overstate the connection, but there is some connection between WAC and the price that consumers pay. So when you say there's some connection, but I don't want to overstate it, that makes me sound like it's pretty remote. No, I don't think it's that remote, Your Honor. I think one of the experts on the other side has acknowledged this as well. I mean, the connection is that higher-cost specialty and non-preferred drugs tend to be on non-preferred tiers in state Medicaid programs. What percentage of the drugs under Medicaid or Medicare – and I'm not asking for – if you have a statistic, you can give it to me, but just your gut sense here – is for these specialty drugs. Is that a lot of what we're talking about? I would assume a lot of Medicaid and Medicare is not specialty drugs. That proposition is correct, Your Honor. So they're not going to be that close to the WAC price? Not correct, Your Honor, because the drugs that are going to be the major subject of this rule tend to be the very high-cost specialty and non-preferred drugs. Why is that? I thought all drugs were subject – most of them fall under the $35 exception? Oh, no, no. What I'm saying, Your Honor, is that as a practical matter, the drugs that are advertised most often on television tend to be the specialty or non-preferred drugs. There are preferred drugs advertised on television as well, and the rule definitely does apply to those drugs, but as a practical matter, the ones that are subject to the rule – Well, that depends on choices by manufacturers what to advertise or not. That's correct, Your Honor, but what they have chosen – The rule here wasn't sort of rationalized on the theory that, in practice, it's only applying to the super-expensive drugs. Well, I disagree with that to an extent, Your Honor. I think the rule does focus heavily on those kinds of drugs. There's nothing in the terms of the rule that limit it to the super-high-priced drugs. That's correct, Your Honor. But, again, as a practical matter, it will apply most often. Practical matter mostly, you said, but not always. No, I agree with that, Your Honor. I'm not taking issue with that. Nobody that pays the WAC – Medicaid, Medicare – they don't pay the WAC. Well, I think that Medicare – you know, they don't pay it directly, except in Part B there is a time at which the WAC is a relevant price that Medicare – Well, it's a relevant price in setting the ASP, but you don't pay the – do Medicare beneficiaries ever pay the WAC? Yes, Your Honor. Before they meet their deductible, sometimes they can pay the WAC, or they pay the negotiated price, which is a closely – which is very closely related. The negotiated price between – The Part D plan and the pharmacy. Part D plan. Okay, but under just Part B, if they – because Medicare Part D is optional, right? Correct. Right. So if you just have Medicare Part B, you would pay the WAC before you met your deductible? Yes, there's a $185 annual deductible under Part B. So you would pay up until that point, and then there would be coinsurance of 20% after that. So really, your price is anchored to the ASP or the WAC. Is it 20% of the ASP? It's 20% of the ASP, yes, Your Honor. All right. But as I've said, the ASP is – These are high-priced studs. I've got to figure that deductible is going to be met, like, on the first couple pills. It could be met quickly, Your Honor, I agree. But, again, after the deductible is met, there's still a coinsurance percentage. And as far as you know, for Medicaid, no one's paying WAC. No state would – their negotiations, I assume, will give them some better price than that. What I would say about Medicaid, Your Honor, is that the higher-priced drugs are more likely to be on non-preferred tiers, which means higher copayments. Right. They're not paying – no consumer that's getting this ad is paying the WAC. They're paying a copayment or coinsurance. I guess probably copayment under Medicaid. Generally, Medicaid beneficiaries pay copayments, Your Honor. That is true. One final point I'd like to make, if you'll indulge me, is that many of these questions, I think, are more appropriately addressed as part of the plaintiff's arbitrary and capricious challenge, which is still in district court. I just want to emphasize that the only question that's up here in front of this board is a question of statutory authority. Is this the kind of rule that falls within HHS's admittedly broad authority under Section 1302? You're intending – one of your goals with this regulation is to limit the price of drugs. Is that right? I would not describe it in that way, Your Honor. Our goal is to create – is to help create a more efficient market in the price of drugs. I don't know what that means. You're trying to limit the price. I thought that – I mean, I understand why you're trying to avoid the answer that I think you should be giving, because you don't have any statutory authority to monitor pricing, right? No, Your Honor. I think we do. I mean, what we're trying to do here – the price of prescription drugs is artificially high in this country. What this rule is designed to do is to make that marketplace for prescription drugs more efficient, which will have the result of making – of reducing the amount that CMS pays. You're jumping from artificially high to efficiency in a way that just – you know, maybe it's me. Maybe I'm having a bad day. I can't see it. Well, Your Honor, I think it's natural to – I mean, it's convenient for you. It advances your case. It's self-serving, but, I mean, I just don't see it. You can call anything efficient. Your reading of mourning produces unlimited results. I mean, you have authority under your reading of mourning to do anything you want. That doesn't take the general area of satisfactory coverage. Your Honor, we respectfully disagree with that. We think this is a closely bounded grant of authority here. This is the theory that we're advocating here, and I have a number of limiting principles on this grant of authority. I mean, first is the phrase efficient administration itself, and not any distant connection to improving the efficiency of Medicare and Medicaid is going to do. You know, the rule has to relate to the very functions that Medicare and Medicaid actually perform, and here the functions are paying for particular drugs, and this rule relates to the very drugs that CMS pays for. Another limiting principle. But I guess I'm not sure that's so limiting because you also pay for doctors, right? We pay for services. Doctors' services. Right, sorry. You don't hire doctors, but you pay for the services they render. Whenever I go in, there's a whole bunch of services they check off, and you get paid for those. But then there's lots of ways you could make that a lot more efficient, make doctors disclose their prices. I think when you're talking about disclosure requirements, Your Honor, it is a lot. The disclosure requirements of the prices of the very goods and services that CMS actually pays for, I don't think that is particularly beyond CMS's authority. I think when you start getting beyond the services and products that CMS pays for. But nothing in this rule is limited to what Medicare or Medicaid pays for, right? This requires disclosure of the WAC for every drug, whether it's to all consumers, whether they're Medicaid or Medicare or general public. That's not correct, Your Honor. The rule only applies to drugs that CMS actually pays for, that are reimbursable. Well, that's what I was asking you at the beginning. If that's 100 percent of all drugs, that's really not much of a distinction. I think it's the majority of drugs, Your Honor. I think it's possible there could be some cosmetic drugs out there that aren't covered. Okay. Robert, are we talking about, I'd really like to know, as a number here, majority could be 51 percent, it could be 99 percent. And as you said, people want to get FDA approval and then they can get Medicare and Medicaid reimbursement. We're told statistically it's like 50 percent of pharmacy payments in this country. It would help me in understanding your theory here as to why this is so limited, to know whether, in fact, the drug manufacturers, the drugs that are covered here are a large percentage of drugs. Your Honor, I think it is a large percentage of drugs that are covered here. I think that's correct. 90 percent or north? I'm not sure what the exact percentage is, but I think it is a large percentage of drugs. That's not what our limiting principle is tied to. There's really no way to advertise. Once you've got this advertising, it goes to the whole public, whether they're Medicaid, Medicare consumers or not. And the same with disclosing how much doctors are charging. It would be the exact same situation. Some percentage of them will be Medicaid, Medicare clients, but some will not. But once you just require the disclosure of what they charge. I don't know why that would be any different under your efficiency theory. Well, Your Honor, again, I think that. You think it would be, right? You can't require doctors to post the prices they charge for services. Well, Your Honor, I think that. Or at least Medicaid and Medicare covered services. Well, I think if you're talking about Medicare and Medicaid covered services, and you're talking about the prices that doctors charge for services that are covered by Medicare and Medicaid, you know, I'm not sure why that is so far removed from. I'm just trying to understand your theory here. You were trying to say that it was limited. But if it's everything that Medicare and Medicaid pays for, that price can be disclosed. So is that right? Well, Your Honor, there are other limiting principles here. But just as for your first one on this efficiency connection, anything that Medicare and Medicaid pays for could be ordered disclosed. So long as it is a non-misleading disclosure. Well, no one's going to suggest that you're ordering misleading. We're not talking about your authority to order misleading disclosures. And so long as it doesn't conflict with another provision of the statute. And there are a lot of other provisions of the statute that impose restrictions here. But your efficiency theory is not. I'm just talking about your efficiency theory. Your efficiency theory is we could require a disclosure by anyone who's getting reimbursed under Medicare and Medicaid of their price, whether it's for services or drugs or whatever it is that they're doing, hospital beds. Your Honor, under that part of our limiting principle, I think that's correct.  But there are other limiting principles throughout the statute. And this Court has looked to those other external statutory provisions in other cases like the Verizon case in determining whether there's a limiting principle or not. And Section 1395 provides that CMS cannot exercise any supervision or control over the practice of medicine, no supervision or control over the manner in which medical services are provided, no supervision or control over the selection, tenure, or compensation of any officer or employee of an institution that provides health care services. So would those ban requiring doctors to disclose the price of the services they provide that are compensable under Medicare and Medicaid? I don't think so, Your Honor. And no supervision or control over the administration of an institution that provides health care services. As we talked about, the Part D program also contains a separate restriction on the federal government interfering with the prices that are negotiated between Part D plans and pharmacy benefit managers and pharmacies. And I point out that in the Verizon case, the net neutrality case, this Court accepted the same limiting principles that we're advocating for here. I mean, that case involved a comparably general grant of authority. In that case, the statute specified that the FCC should, quote, encourage the deployment on a reasonable and timely basis of advanced telecommunications capability. This Court there acknowledged that that rule certainly involved decisions of great economic and political significance. The Court also acknowledged there that the agency's assertion of authority was new and that the agency had, in fact, previously disavowed the authority, which is not the case here. And yet the Court dismissed concerns about the lack of a limiting principle. Like we do here, the Court observes a general grant of authority. There has to be read in conjunction with other provisions. And like we do here, the Court emphasized that any regulations must be designed to achieve a particular purpose. And this is a broad grant of rulemaking authority that Congress added to the statute. I mean, Congress could have limited it to internal. What's your response to our Motion Picture Association case in which there was a recognition that, at least when it comes to adopting regulations with First Amendment, significant First Amendment consequences, that's going to be presumed to be within a delegation, general delegation of authority? Your Honor, on that particular point, we don't think that this regulation implicates significant First Amendment concerns. But if it did, that case would, you'd lose under that case. If this rule were interpreted as implicating significant First Amendment consequences, would you then lose? And your point is just that it's not significant. No, Your Honor. We have a number of other reasons why the Motion Picture case is not on point here, Your Honor. There, there was a statute that required the agency to issue rules governing closed captioning. And then in an immediately adjacent provision, there was another provision that just required the agency to issue a report to Congress about video description. And what the Court did was compare those two and say, well, Congress knew at that point how to require the agency to issue regulations. And instead, with video description, it simply required the agency to issue a report. And so there was a much clearer indicia from the statute there that Congress denied. There's a statute here that talks about drug prices. It's directed to the same secretary, although the sub-delegation is to the FDA, and says, you know, you can do, you can require disclosures that prevent something from being false and misleading, but you can do nothing else expressly. So the Food, Drug, and Cosmetic Act, Your Honor, is a different statute, enacted at a different time by a different Congress addressed to totally different purposes. Does that matter for purposes of this analysis? I think it matters a lot. I don't think it did in Gonzales. I'm sorry, Your Honor? I don't think it did in Gonzales v. Oregon. Your Honor, I think it matters a lot here because that case, all of the FDA's authority under the Food, Drug, and Cosmetic Act is directed at safety and efficacy. And that's what Congress was concerned about when it passed the Food, Drug, and Cosmetic Act.  But you have a statute that says secretary, it doesn't say FDA, it says secretary, you may, when it comes to drug prices, you may sort of police and require disclosures designed to prevent false, misleading, dangers to health representations, but no more secretary. And then the secretary says, well, let me turn to this other statute over here, and then this prohibition on me as secretary doing these things doesn't seem to apply. Your Honor, I don't see any inconsistency between those two statutes. I mean, the FDCA is in a totally different sphere than the Social Security Act. The FDCA is about safety and efficacy. The Social Security Act is the prime statute for regulating drugs and drug advertising. That's where Congress thought drugs and drug advertising were going to be regulated. I think that might be a fair reading of the statutory structure. I would quibble with that a little bit, Your Honor. I'd say that's where Congress thought that any decisions related to the safety or efficacy of drug advertising would be made. But I don't think that there's any indication in the FDCA that the statute simply occupies the field of all prescription drug advertising. I think it's a narrow, well, it's not that narrow, but it's a broad area related to prescription drug advertising. Well, we don't need to occupy the field under Motion Picture Association. We make reasoned judgments looking at what Congress did, what it said. And so what are the implications for the assertion of authority here? I guess your answer there is you can't do that across statutes? Well, Your Honor, my answer is that I don't think that the FDCA has anything to say about the Social Security Act in this context. I think when you're – the two statutes, as I've said, are directed at totally different realms. Does it have something to do with the authority of the secretary? Well, it's related only in the sense that the FDA and CMS are under the same secretary. But as a practical matter – My colleague is asking if the secretary is prohibited from doing something in the statute, you can say, well, but we're going to look under this statute. And they didn't pick up – they didn't authorize to do what we want to do, but they don't address it the way it was addressed in the other statute, and so you're home free? Well, Your Honor, I would say that under the Social Security Act, the statute explicitly gives the secretary the authority to adopt rules related to the efficient administration of Medicare and Medicaid. That is totally different from the authority that is granted to the FDA under the Food, Drug, and Cosmetic Act, which is limited to ensuring the safety and efficacy of prescription drugs and regulating drug advertising. Well, it's not limited to that. I mean, they do have authority over prescription drug pricing advertisements. They can police those, right? As they relate to safety and efficacy. Well, it's not over prescription drug pricing. Well – I mean, they cite this 1975 Federal Register, where at least then the secretary seemed to be very careful to say, we will make sure things – advertisements are accurate, but we're not mandating disclosure of prescription drug prices. And again, the FDA was interpreting different statutory provisions, and here we have a separate statutory provision as part of a different title of the U.S. Code, a different statute that talks about the efficient administration of Medicare and Medicaid. And I just think it's too much of a stretch to import some congressional – import congressional silence under the Food, Drug, and Cosmetic Act into the Social Security Act. I mean, it would be much clearer if FDA and CMS were simply in different agencies. And the only reason this argument has some facial plausibility is because they happen to be under the same secretary. But I think we all realize that if they were separate agencies, they would – Well, then the fact that Congress commanded the secretary not to do something wouldn't matter. I think – I don't think you can brush it off that lightly when Congress has made a command to the very same secretary that is issuing this rule. One other question I wanted to just make sure I'm clear on. To ask you about Medicare and Medicaid pricing, I had thought one of the stronger points in your brief was, look, this is limited to those companies who choose to participate in Medicare and Medicaid. If you don't participate in that, you don't have to do this. But none of that is contractual, the participation of Medicare and Medicaid? Or – and it wasn't – it didn't sound like it was contractual. I mean, it's just contracts with other people, but it's not directly with – No, I believe there are direct contracts between drug companies and CMS, where drug companies agree to pay rebates to 340B entities, to states, and to certain Part D beneficiaries. But this rule goes beyond those folks that have chosen to enter into contracts with the government. It's anyone who's reimbursed even under Part B. Well, I think that the categories are coextensive, Your Honor. I think that any drug company that wants its products to be reimbursed by Medicare or Medicaid needs to enter into these contracts. Right. That's how it works. Okay. Okay. All right. Thank you. Before you sit down, Mr. Davis, let me ask you something. I've watched a lot of ads on TV for drugs. I've never seen the first one that mentions cost other than saying if you have difficulties, something called AstraZeneca can help. So the problem is the cost of prescription drugs. I don't see that this is a solution to that. I don't see this as a solution to a problem. The problem isn't, as you posited somebody seeing on TV, oh, this is a drug I can use, but it's way too expensive. I mean, am I just in a different market? I've never seen an ad that says what the price is. I think that's true, Your Honor, and I think that's the very problem that this will. Well, so now you're going to say or tell Merck you've got to put the WAC cost in, which is, I think, according to the record, not the price they'll ever pay. And why isn't that adding confusion where there isn't any? You keep saying that people don't get these drugs because they're told on TV that they're too expensive. I'm just saying I've never, ever seen an ad that says what the cost is, any cost. Your Honor, our point here is that that's true, that right now. So how is this, I mean, if people aren't being stopped from getting the drug because the cost is too high, according to a TV ad, how is this going to help them when you're requiring them to put a cost in that they're not going to pay? Well, the point here, Your Honor, first of all, it is in some circumstances the cost that they will pay, but not at all, we acknowledge. But the point here, the point of this rule is to give consumers an understanding of, in general, whether they are likely to pay more or less for a drug. Right now they have no anchor point at all to figure out how much a drug is going to cost, and really neither do doctors. And the point here is to show consumers and doctors how much a particular drug costs so that the consumer and the doctor can have an informed discussion then about whether there are any overpriced alternatives or potentially therapeutic alternatives that can be achieved at a lower cost. And the very problem here is that no one does know what the price of these drugs are, and so it leads to overprescriptions of really... I'm sorry to interrupt, but if that's the very problem, your rule doesn't address that because it does not disclose or require disclosure of prices actually paid. Well, Your Honor, again, the point is not to require the disclosure of the price that's actually paid in all instances. That would be impossible in a pricing system as complex as this. A price that's almost never paid. It's a price that's rarely paid, Your Honor. But the point is to give consumers a general sense of an anchor price, a price that suggests to them that they're likely to pay more or less for a particular drug as the WAC goes up or down. And I would point you... Well, all I wanted to say was, following up on Judge Edwards' questions about efficient administration, even giving you that this falls within the word administration, I don't see how it falls within efficient at all. Well, our position there, Your Honor, is that price transparency improves efficiency. It's an economic principle that I think has been applied in many different contexts. And if people know the price of these drugs, they're able to price shop, which improves efficiency. Is there any economist that says price transparency that is not the price people will pay improves efficiency in this sense? Improves? I don't know what the transparency is if it's not the price they're paying. Well, Your Honor, again... I'm not going to say that if I just disclose the... You call it the list price. People think that means something, but I don't think it does in this context. Well, Your Honor, the MSRP on an automobile is also not the price that people pay, and yet it's well accepted that requiring disclosure of the MSRP price on automobile advertisements improves price transparency. This may be a more complicated market than the automobile market, but the principle is the same, that the WAC is an anchor price, just like the MSRP is an anchor price, and it doesn't tell you what you're likely to actually pay, but it sure does give you a good indication of whether you're likely to pay more or less in general for a particular product. All right. We'll give you some time to reply. Thank you. Mr. Brass? Good morning. Good morning, Judge Henderson, and may it please the Court. I'd like to start actually where my brother started, where he said that the statutory question in this case begins and ends or begins with the plain text of the statute. He often veered off of the plain text in his remarks, but the plain text is instructive. What it says is that the Secretary has the authority to issue rules that are necessary for his efficient administration of the functions with which he is charged under Medicare and Medicaid. So one has to look at what functions is he charged with. Was contracting one of those functions? Contracting with prescription drug companies? Your Honor, Congress has provided what those contracts have to say. I'm just asking you whether contracting, negotiating prices, that's not part of the administration? Negotiating prices with the drug companies is not part of his administration, Your Honor, because Congress has provided what the prices are that Medicare and Medicaid. He said they negotiate some rebates, at least under Part D. No. And there's a whole rebate program under Medicaid. And it's statutorily set up, Your Honor. What the statute provides, let me just start with Medicaid, for example. I'm sorry, that's completely functionary on their part? They don't have any exercise of discretion or judgment in this whole process under Part D or the Medicaid rebate program? Certainly, Your Honor, they've got interstitial authority to interpret a particular provision and even make rules with regard to, for example, forms of claims. They do a lot of rulemaking under certainly the Medicaid rebate program and I think under at least Part D. But what the rebate program provides, Your Honor, is, and it's statutory, is that every, I think it's quarterly, the drug companies agree that they will pay rebates to the states. Well, what those rebates do, plenty of fights about what those rebates are. And the Secretary. And the formula for calculating, that's all within their administrative authority. Your Honor, I would think that the fact that Congress has set forth what the function is in that context, in other words, whatever flexibility that the Secretary has with regard to the rebates that are being agreed upon, which is a statutory point, Congress has given not only a goal of lower drug prices, but a means to achieve that goal. What the Secretary can't do is say, I know that Congress in general is interested in lower prices, so I'm going to take my authority to administer the functions with which I'm charged, and bootstrap that into the authority to create entirely new functions that aren't in the statute. So think past a regulation that said, instead of this one, if it just said, any manufacturer who's participating in Medicare or Medicaid must include at the bottom, the same font type, the exact same positioning as this one, a statement that says, for information on Medicare and Medicaid pricing, go to X website. Right. Would that be? No. Would that be within their administrative authority or their statutory authority? No, Your Honor. And in fact, the record is instructive on this. I don't know how the record can be instructive on this, because this is a hypothetical. Well, but it is instructive, because there is a discussion at JA-18 of what the enforcement mechanisms are for this particular rule and what they're going to be. And the Secretary discusses that comments were introduced saying that you should think about making it a condition of coverage. And the Secretary notes that there was a comment filed, and the comment was filed actually by a congressional agency, MedPAC, and MedPAC favored that, but said you would need to change the statute. You would need a statutory amendment in order to do that. So you said it's a condition of coverage. What I'm saying is all they're requiring you to do is disclose, not a price universal, but tell people if you're Medicare or Medicaid, you're covered by Medicare or Medicaid, here's where you can go to figure out what your price is. Do you think that would, they don't have the authority to do that? Well, I don't think that they've got the authority to do that, Your Honor, particularly in the manner in which you suggest it. And I'll discuss otherwise in a moment. But the manner you suggested is by having that in the rebate agreement. Executing a rebate agreement is a condition of coverage under Medicare and Medicaid. And so requiring us to sign on to or agree to provide that message to consumers within the rebate agreement would translate it into a condition of coverage, and they lack the authority to do that. And they've never claimed that they have the authority to do that. There's a distinction here, Your Honor, between their claim that there's a statutory provision that bars them from doing that? Your Honor, there isn't any. Is there a condition of coverage? What the Congress has done is it's set up what the conditions of coverage are. And it's made it very express. In other words, there's very few with regard to drug companies. The ones that exist have to do with agreeing to pay certain rebates to Medicaid, agreeing to certain pricing with regard to Medicare Part B. That pricing relies, as my brother said, on ASP. If Congress had intended to provide the Secretary with just general authority to include them. Where is the statutory list of these conditions and what cases said that they have no authority whatsoever? Your Honor, there isn't a provision that says they've got no authority whatsoever. What I'm suggesting is that Congress has so specifically set out. So you would have the argument that they couldn't do it? Exactly. I'm not suggesting that there is a statement. What is that statutory provision? Which one is this? So the rebate agreement provisions are at 42 U.S.C. 1396R-8, little a in the hole. Connected to that, there's a provision, 42 U.S.C. 1396R-8, little b in the hole. The second one that I've stated. Little b in the hole? B in the hole, sorry, in parentheses. Oh, in parentheses. Sorry. Sorry. The reason I cited the second one is in order to put into effect the Medicare Part B agreements, which require ASP-related pricing, Congress passed a statute, the one I quoted, cited that requires drug companies to provide that very information to the Secretary so the Secretary can enforce it. So the Secretary can disclose that information? Probably could, Your Honor. At least as to average, at least as to WAC, the Secretary probably could. Oh, as to what Medicare and Medicaid are paying? Well, as to, oh, as to the actual price they're paying, yes, they could, Your Honor. As to ASP, there's some confidentiality provisions in the disclosure requirement that Congress has put in. So if one interpreted those confidentiality provisions, you might decide that they, by implication, would prevent the Secretary from disclosing those public information. And the first set you gave me, because I didn't get your in the hole thing, was 1396R-8 what? Small a. Small a, got it. Sorry about that, within parentheses. Okay. Getting back to it, Your Honor, what Congress has done is when it wanted the Secretary to interact in any way with regard to drug pricing, to lower drug pricing, it actually passed laws that said you can require rebate agreements and it said what those rebates should be. It passed laws talking about how to determine pricing for Medicare Part B. For Medicare Part D, it didn't include any of that, but it did require an agreement as a condition of coverage that would require certain pricing for people who are in the gap period of their Medicare Part D coverage. For A, there is no agreement. For Medicare Part A, the drugs are simply sold and they're reimbursed. So there's no volitional aspect to that. Under Part A, is it the same ASP formula or is it a hospital-specific formula? Part A, you're charged the medication as part of your hospital stay. So it's whatever deal the hospital has? It's more by procedure. In other words, the hospitals get reimbursed for treating particular conditions and the drug price is just folded into whatever Medicare pays the hospital. Getting back to the language for a moment, Your Honor mentioned Gonzales v. Organ, and I think it's relevant here because Gonzales v. Organ dealt with very similar statutory language. The language in that case gave the Attorney General the authority to enact rules necessary for the efficient execution of his functions. And the very same argument was made, as the government is making here, that that should be interpreted very broadly, allow the Attorney General to do essentially anything that related to what his duties were. The Supreme Court looked at that language very specifically and said that it would go against the plain language of the statute to treat a delegation of authority to execute functions with which he is charged to delegate the further authority to create new functions with which he is not charged under the statute. In fact, the Court distinguished the language that's very narrow there, and in this case, from language that deals with carrying out the provisions of the Act, which the Court said is more broad than that. Did they not also look to other statutes that have been enacted as well outside the statute? Yes, the Court did there as well as it did, of course, in Brown v. Williamson, as this Court knows. With regard to that, I think it's important not only that you can look at different provisions, but when you look at what Congress did with regard to the FTCA, and you look at what Congress did with regard to within the Social Security Act, giving the Secretary the authority to review marketing materials for Medicare Advantage plans. In both cases, Congress did that quite explicitly, gave the power explicitly, but also subject to quite explicit limitations. I think what we learned from that is when Congress is giving the authority to regulate speech in these instances, for the Secretary to do that, it takes care, and it does it very expressly and subject to limitations. In that sense, this case is similar, as Your Honor mentioned, to MPAA, where the Court remarked that the power in that case to regulate content is one that obviously can impinge on the First Amendment. No one can get out of it. I mean, here you can get out of it by just saying, fine, I'm not going to participate in Medicare and Medicaid. Your Honor, it's unrealistic. Well over 90 percent of drugs are covered by Medicare and Medicaid. Is there an actual statistic somewhere? What's that? Is there an actual statistic somewhere? I had assumed it was in the high 90s, but that was just my uninformed assumption. Your Honor, it is well over 90 percent, but I don't have a source to cite for you for this purpose, because we don't have one in the brief. In terms of the breadth of the power that's being claimed, Your Honor, it's not at all narrow. We were given and understood. It's not at all. It's not narrow at all, Your Honor. While the government has indicated that, well, it only has to do with things that are paid for under Medicare and Medicaid, it also, of course, has to do with people who are treated under Medicare and Medicaid. Presumably it would make Medicare and Medicaid more efficient if the Secretary could require beneficiaries to do some exercise. Perhaps it could legislate, could promulgate rules with regard to what their diet should be, because if people are healthier, it's going to save money, too. Well, their answer to that is, look, we don't directly regulate the people, but we do have regulations and a regulatory role with respect to drug manufacturers. I think that's the answer that he was foreshadowing. I don't think that that answer is satisfying, Your Honor, for a couple of reasons. First of all, with regard to beneficiaries, we do require, the government does require under statute, lots of things about claims and lots of things in order to find out that they have particular conditions. It's not the same thing. It doesn't regulate their behavior. Not yet. In any way. Not yet, Your Honor. No. But where the power has been given. No, but it does regulate. That's too easy for you. Well. But it does regulate drug manufacturers' behavior as part of their participation here. It's maybe limited. But in very specific ways, and I think that there's a negative pregnant there, Your Honor, where Congress has wanted to come in, because for the most part, as you pointed out, this program is not a program kind of like the FCC has, where you're regulating an entire industry. Under the Social Security Act, the power here is to administer particular government insurance programs, not to be a regulator of primary conduct of drug companies in the marketplace, which is, of course, a very different power. So I do think that the claim that they can go beyond administration of the insurance programs to regulation of primary conduct brings up, you know, a phrase that the Court used in Utility Air, which was if what the Secretary is claiming is the ability to have, you know, to introduce an expansive and enormous expansion of regulatory power, one would expect to see Congress discuss that clearly. The Secretary has never claimed the ability to regulate the conduct of drug companies in the marketplace. And that's precisely what this does. These ads go out not only to Medicare and Medicaid beneficiaries, but to the general public. And in response to some of Your Honor's questions, they will mislead and confuse and intimidate the people who receive them. Well, that's the arbitrary and capricious point. And the First Amendment point as well, Your Honor. That's a different point. Now, how do you get around Verizon and Doe, the FEC case? Certainly, Your Honor. Let me start with Verizon, and then I'd love to actually address Doe, Mourning, and to work within that line of cases. As far as Verizon goes, it was a much more specific grant of authority. Section 706 deals with advanced telecommunication services. And the main question before the Court essentially was whether the command was oratory or whether it was actually giving power. And the Court, of course, has gone two ways on that because the agency has gone two ways on that. Initially, the agency viewed it one way as merely oratory, and the second time I think it said that it was an actual, no, vice versa. Sorry. The first time they said it was oratory, the second time, anyway. They looked the other way. I think Your Honor might have been on one of those cases. But it was a much more specific grant of statutory authority. This one is dealing only with the administration of the program, of the efficient administration of his functions under the program, which is a much more general provision in certain ways, but begs for pointing out specific statutory provisions. In fact, if you look at MPAA, it's relevant in another way, and I'll get in a moment to Mourning it, sir, I promise. But with MPAA, the Court looked also at Sections 303R and 4I, which are very general rulemaking authority provisions. They deal with carrying out the provisions of the Act. And what the Court said as to 303R is that it requires a specific statutory authority in order you can't just regulate the public interest. You've got to be able to point to something in the statute that you are implementing. And with regard to 4I, what the Court said is it's similar to a necessary and proper clause, and it most gives you the power to issue regulations that are reasonably ancillary to specific provisions. Well, the same obviously goes here, but even in spades, because in this case the delegation is narrower. His functions under the Act, you've got to be able to point to a function. As to Thorpe, Mourning, et cetera, actually I really appreciate the ability to address that because I think there's been a lot of confusion in the law for several decades about it. If you look carefully at Thorpe and at Mourning, at Doe, and at this Court's decision in National Welfare v. Matthews, all of them dealt with this language, but not in the way that the government says. What they did is they first looked at the question whether Congress has delegated to the agency the type, the authority to issue the type of regulations that were at issue. And only then, after addressing that question and deciding that the type of regulation at issue had been authorized, did the Court then use the language about reasonably related to the purposes when addressing whether the particular regulation that was issued was a valid one. It was much more like either a contrary to law or arbitrary and capricious analysis, but it didn't have to do with the first level question. There's really no way to read Mourning, Thorpe, et cetera, particularly when you read them closely and then in light of Chevron later, to give anywhere near the broad sort of thesis the government would give, which is regardless of what the general rulemaking provisions say, you've got this overarching authority to issue regulations that are reasonably related to the purpose of the statute. How do you distinguish the FEC case? I'm sorry? The FEC case. How do you distinguish Doe? Doe, Your Honor, I think comes as close as one can come to a situation where you don't have to point at a particular provision that gives you underlying authority to issue, in that case to disclose particular information, because it was essentially a housekeeping or how we run our own organization type of rule. Agencies are presumed to be able to issue rules that govern their own internal conduct. In comparison to that, I think if you looked at Matthews, which actually did have to do with 1302, the same statute that's at issue in this case, that case involved the ability of, it was HEW in that case, and what the court was looking at was whether they had the delegated authority to require that states took into account the assets that an AFDC recipient had. The court didn't just look at 1302 itself and say, yes, it's reasonably related or anything like that. What the court looked at is there were specific statutory provisions that told the, in that case, the secretary of HEW, that his authority or his duty was to ensure that state plans had sufficient provisions for the proper administration of the program. And then it looked even more specifically that there was a statute that required states to take into account the resources that AFDC recipients had. So the court went from 1302's general language to find something far more specific that was in fact being administered in the case. And the court said, therefore, the secretary has the sort of authority that he's claiming here. Which, by the way, in that case, ended up saying it was invalid, because it wasn't, it was inconsistent statutorily with other parts of the Act, and also there wasn't a sufficient record to support it. So I think the best way to think of the case overall is it's at most sort of an articulation of how Chevron Step 2 might apply when you're looking at the underlying validity of the rule itself, and it was never applied to determine whether the delegated, there was delegated authority to issue that sort of. Just, there were a couple of questions, I think, that Your Honors had about how the, how pricing is determined. I'm happy to answer your questions if you'd like, because we certainly have the information. It's different in many instances from what the government told us. Do you need to clarify something? Yes, well, I'd just like to, I guess, clarify a couple of points, Your Honor. First of all, WACC is not only not the price, or a price that is rarely paid, but for more than 120 million Americans, it bears no relationship whatsoever to the price that they pay. On Medicaid, people pay a maximum of an $8 copay. So WACC has nothing to do with it. Medicaid? Medicaid, an $8 copay. By the way, there's one exception, which is Kentucky, where I think the copay is a little bit higher. But for the other 49 states, it's $8. For Medicare Part B, there is a $185 deductible, as the government said, and it is true that coinsurance is 20%, but it's also true that 80% of recipients have supplemental insurance, which results in them having no coinsurance payment at all or just a small copay. When you go to Medicare Part D. But even then, the coinsurance is indirectly tied to WACC. The coinsurance is tied to ASP. It's ASP, Your Honor, and not WACC, and so therefore it takes into account the discounts and rebates that the wholesalers pay or the wholesalers receive from the manufacturers, so it's a different number as well. And then if you get to Medicare Part D. Medicare Part D, about 40% to 50% of the people that do Medicare Part D only have copayments. Sorry, 47% to 50% don't have deductibles that cover insurance. In terms of copay versus coinsurance, 99% of those who are covered by Medicare Advantage plans pay only copays for preferred drugs. Seventy-seven percent of those who are covered by standalone prescription drug plans only have copays for preferred drugs. If you take all of this into account and you understand that even for individuals, what they pay is going to vary during the course of the year based on deductibles, based on whether the particular drug is preferred, non-preferred, et cetera, the government's comment that telling people WACC gives them an anchor is actually far more dangerous than helpful because as the government said, it's an anchor that acts as a gravitational force on everything that follows in the ad. So they're given this number, WACC, that not only doesn't tell them what they're going to pay, but even from a relative basis might be highly misleading. A drug might have a higher WACC. Your Honor, I'm just responding and clarifying, if I might. It's actually my First Amendment. Well, he's also responding to my questions, trying to understand how the whole scheme works. And I'm trying to. No, it goes to understanding how the whole scheme works. Your Honor, I'll try to be very brief about this. The government's pitch is that this gives you important relative information. And it doesn't quite often because a drug can have a higher WACC, but if it's preferred, it can have a much lower, and for a particular individual, it can have a much lower out-of-pocket payment. It could be a $5 out-of-pocket payment than the drug that has a lower WACC. So that gravitational force is a dangerous one. And the caveat that they've ended to it that says if you have insurance that covers prescription drugs, your price may be different doesn't take that away. First of all, as the government said, it's a gravitational force. The weak disclaimer isn't going to take it away. Secondly, though, the terms of that disclaimer, first of all, suggest that if you don't have insurance, that will be your price. And as we pointed out in our brief, that often won't be the case. Secondly, telling people that have insurance, your price may be different, doesn't tell you your price will almost certainly be far lower. So rather than actually clarifying things, their disclaimer lulls you into the feeling that your price will be in or around the amount, and it's not going to be so different. Thank you. All right. Thank you. Does Mr. Davis have any time? Why don't you take two minutes? Thank you, Your Honor. I just have three quick points to make. The first is that a good way to think about how this rule relates to the efficient administration of Medicare and Medicaid is to remember that the Secretary is effectively the trustee of Medicare and Medicaid. The Secretary is responsible for efficiently administering the Medicare trust funds in the best interest of the recipients. And the best interests of a Medicare beneficiary are to pay a market price, a lower price for their drugs, rather than a higher price. That's my first point. My second point, Your Honor, is about the Food, Drug, and Cosmetic Act. I think it's important to recognize that with respect to the FDCA, the question here is what Congress intended. And a Congress that enacted the Food, Drug, and Cosmetic Act would be very surprised to learn that anything it was doing would affect HHS's rulemaking authority under a totally different law. And the final points I'd like to make, Your Honor, is on limiting principle. My colleague on the other side brought up the example of mandating exercise, mandating a particular diet. Nothing in our theory goes anywhere close to those hypotheticals. CMS, as we've talked about, does not pay for exercise. It does not regulate exercise. It does not regulate diet. But the one thing that we know CMS does regulate is prescription drugs. And CMS pays for those drugs. This rule is tightly connected to the very products that CMS actually pays for. And I think it is a circumscribed grant of authority. Do you agree with their reading of 1396R8 that the contracting conditions, because the two in the statute can't be added to and that you couldn't require them to roll on? I assume you don't because this is a lesser-included version of what you've done here, to roll on the bottom for information about Medicare, Medicaid pricing, go to X website. Your Honor, I think that the Secretary's authority would extend to requiring, under this statute, a drug company to advertise or include its prices on a particular website, if that's what you're asking. Are there other contracting conditions that can be imposed? Has the Secretary imposed any conditions on contracting other than the statutory ones? I'm not aware of other conditions, Your Honor. There are no further questions. All right. Thank you. The Court will take a short break.
judges: Henderson, Millett, Edwards